United States District Court
Southern District of New York
——————————————————————

UNITED STATES OF AMERICA

      - against -            10 Cr. 1159 (JGK)

STEVEN TORRES,             <u>MEMORANDUM OPINION AND</u>
                                  <u>ORDER</u>
                Defendant.

——————————————————————

JOHN G. KOELTL, District Judge:

     The defendant, Steven R. Torres, has been indicted on one count of violating 18 U.S.C. § 922(g) for possessing a firearm after having been convicted of a felony.  He moves to suppress a firearm that was seized on September 21, 2010 at the time of his arrest.  The Court held an evidentiary hearing on March 11 and March 23, 2011.  Having assessed the credibility of the witnesses and considered the exhibits presented by the parties, the Court now makes the following findings of fact and reaches the following conclusions of law.

I.

A.

     The information that the arresting officers had on September 21, 2010 included information that two of them had obtained as a result of a June 1, 2010 arrest of the defendant.

On June 1, 2010, New York Police Department ("NYPD")
Officers Stephanie Cepeda and Juan Pacheco, while on duty, were
informed of a domestic violence report that had been filed
earlier in the day. (Tr. 5-6.) They were told that the
complainant reported, among other things, that her boyfriend had
threatened to kill her, that he kept a firearm in a dashboard
compartment in his car, and that the compartment was disguised
as a speaker. (Tr. 5-6.) The officers were given a physical
description of the defendant. (Tr. 5-6.)

While on patrol that day, Officers Cepeda and Pacheco saw a
car fitting the description they were given near the
intersection of Southern Boulevard and Longwood Avenue. (Tr. 6-
8.) They stopped the car near the stationhouse and pulled the
defendant out of the vehicle, at which time they saw a gravity
knife in plain view in an open console between the driver's and
passenger's seats of the car. (Tr. 8-9.) Officer Cepeda then
went into the stationhouse to review the domestic violence
report. (Tr. 9.) The report contained a report by the officer
who took the statement of the complaining victim ("C/V"), as
well as the statement of the complainant herself.

The officer reported: "C/V states perp[etrator] has a
history of being violent and she is fearful that perp stated he
is going to shoot her. Perp has a gun and threaten[ed] to use
it on her and child and family. . . . C/V states perp has the

2

gun in his car.  Acura gray in color.  C/V also states the gun
is in a hidden compartment that looks like a speaker." (Tr. 15;
GX 161 at 1.)  The statement by the complainant read: "I am
afraid he will hurt me and my daught[er] if he goes to get her.
He said he [would] rather see us dead before I have the baby.
He said I have 24 hours to call him if not my family is going to
get hurt.  He has a firearm.  Gray 4 door Acura with rims.  On
the dashboard there's a compartment that looks like a speaker.
It opens and it's in there." (Tr. 16; GX 161 at 2.)

The report identified the suspect as Steven Torres, which
matched the name of the individual Officers Cepeda and Torres
had stopped outside.  (Tr. 16.)  Officer Cepeda went back
outside and told Officer Pacheco that they had the right person
and they placed the defendant under arrest. (Tr. 16-17.)

After the car was driven to the precinct house, Officer
Cepeda searched the compartment under the speaker cover on the
dashboard, which she found as described in the domestic violence
report, but she did not find a firearm.  (Tr. 17, 60.)  The
pictures of the compartment introduced at the hearing indicate
that the compartment was in fact modified and could be used for
storing a weapon. (GX 115, 179, 180.)

Officer Cepeda also reviewed the defendant's arrest
history, which indicated numerous arrests including arrests for
violent felonies.  (Tr. 20-22; GX 47.)

Office Cepeda spoke to the complainant at the stationhouse later that day. (Tr. 18.) When Officer Cepeda said that she had not found the gun in the car, the complainant consented to a search of the residence she shared with the defendant and signed a written consent. (Tr. 18-19; GX 213.)

Later that same day, Officers Cepeda and Pacheco searched the residence shared by the defendant and the complainant. They recovered, among other items, an imitation starter pistol that resembled a real gun, a gun holster, and a police baton. (Tr. 19-20; GX 218.) The complainant told Officer Cepeda that the imitation starter pistol was not the firearm that she had described in her domestic violence report. (Tr. 20.)

On June 2, 2010, Officer Cepeda executed a complaint against the defendant in Bronx Criminal Court. (GX 3501-J.) The complaint charged the defendant with three counts of criminal possession of a weapon in the fourth degree, based on the gravity knife found in the car and the police baton and imitation pistol found in the apartment, as well as a count of unlawful sale, possession, or use of an imitation pistol. (GX 3501-J.) On September 2, 2010, Officer Cepeda executed a superseding complaint changing one of the criminal possession of a weapon charges to a firearms charge based on the determination that the pistol was an air pistol and omitting the charge relating to the baton. (Tr. 64; DX A.)

4

Neither Officer Cepeda nor Officer Pacheco had any further encounter with the defendant until September 21, 2010.  (Tr. 23, 170-71.)


**B.**

On the afternoon of September 21, 2010, Officers Cepeda, Pacheco, and Santiago were on routine patrol in an unmarked car. (Tr. 4, 23-24).[1]  The weather was dry, clear, and sunny.  (Tr. 24.)

At approximately 1:19 p.m., the officers were traveling southbound on Hewitt Place toward Longwood Avenue. (Tr. 25, 66, 109, 171; GX 212).  Longwood is a major east-west thoroughfare with two lanes for traffic in each direction separated by a double yellow line.  As they came to the intersection of the two streets, each of the officers credibly testified, they saw a gray Acura sedan double parked to the right facing westbound on Longwood Avenue.  (Tr. 26, 31, 109, 120, 172.)  As they crossed Longwood Avenue, Officers Cepeda and Pacheco saw an individual, later identified as the defendant, get out of the car. (Tr. 27, 172.)

---

[1] Officers Cepeda and Santiago testified that Officer Santiago was driving, while Officer Pacheco recalled Officer Cepeda driving.  (Tr. 24, 119, 171.) It is more likely that Officers Santiago and Cepeda are correct, because their testimony agrees and because Officer Santiago is more likely to remember accurately whether he himself was driving than Officer Pacheco is to remember which of the other two officers was driving.  The differences in recollection are unremarkable and do not affect the credibility of the officers.

After crossing Longwood Avenue, the officers turned around on Hewitt Place, intending to go back to Longwood Avenue and see why the car was double parked. (Tr. 27, 172.) When they came back to the intersection, at this point facing north on Hewitt Place, they saw the individual get back into the car and make what they viewed as an illegal U-Turn, now traveling east on Longwood toward them.[2] (Tr. 27, 109, 172.) The driver made a right on Hewitt Place, passing the officers and picking up speed as he did so. (Tr. 27-28, 102-03, 109, 172.) Officer Cepeda testified that the driver looked at them in a suspicious way as he passed by. (Tr. 27, 102-03.)

The officers turned around again, intending to follow the car and issue a traffic summons. (Tr. 28, 110-11, 172). Following the car down Hewitt Place, they saw the car turn right onto 156th Street. Although each of the officers testified that

---

[2] The defendant argues that Officer Cepeda's testimony is not credible because the case summary written by the assistant district attorney handling the case, based on her interview with Office Cepeda, states that "[the defendant] sees [police officers], jumps back into his car and makes an illegal U-turn crossing over the double yellow lines, directly in front of police car." (DX. B.) The minor discrepancy of whether the defendant saw the officers before he got back into his car, or afterwards, does not alter the credibility of Officer Cepeda's testimony. The notes do corroborate both the double parking by the defendant and his illegal U-turn. There is, of course, no assurance of the accuracy of the assistant district attorney's notes, although it was her practice to write case summaries based on what she is told by the arresting officer. (Stipulation, DX X.) And Officer Cepeda testified at the suppression hearing that the defendant looked at the police car as he passed it, and even the defendant acknowledged that he recognized the police car when he passed it. (Tr.27, 102-03, 210-11.) Having assessed the credibility of the three officers and the defendant, all of whom testified at the hearing, the Court finds that the discrepancies between the notes and Officer Cepeda's testimony at the hearing do not undermine the credibility of her hearing testimony.

the vehicle failed to stop at a stop sign at the corner, there are no contemporaneous records reflecting that traffic violation, it was not relied on at the time or included in notes taken by the assistant district attorney handling the case, and the Court would not rely on it now.[3]  (Tr. 28, 111, 172.)  The car then turned left from 156th Street onto Prospect Avenue, after which the officers signaled to the defendant to pull over. (Tr. 82, 123.)  The defendant stopped the vehicle near the intersection of Prospect Avenue and Beck Street, about three blocks south of 156th Street.  (Tr. 28, 111, 173, 195.)

The defendant tells a somewhat different story.  He alleges that he was not double parked on Longwood Avenue, but that he was legally parked in front of his residence on Longwood, where he had gone for lunch.  He testified that an SUV belonging to a neighbor was double parked on Longwood.  (Tr. 207; DX N.)  He testified that when he left his residence and returned to his car, he asked the neighbor whether she wanted his parking space and she said that she did not.  (Tr. 206-07, 221-22).  He testified that he began driving west on Longwood toward Prospect Avenue, but, because of traffic at that intersection, he backed

---

[3] The defendant argues that the Court should discount the officers' testimony because the case summary by the assistant district attorney (DX B) and the notes of the Assistant United States Attorney of his interviews of the three officers do not mention the defendant's failure to stop at the stop sign. The omission does not affect the general credibility of the officers' testimony, particularly given the fact that the officers may have focused on the illegal U-turn and the double parking, which were the focus of the initial stop of the defendant.  Moreover, a focus of the interviews was also on the details of the stop and the discovery of the firearm in the car.

up on Longwood, backed into a parking garage on the north side of Longwood, and then pulled out and crossed the double yellow line to proceed east on Longwood.  (Tr. 207-08.)  He then made a right onto Hewitt going south and passed the car with Officers Cepeda, Pacheco, and Santiago on Hewitt Place.  (Tr. 211.)   The defendant did not testify as to whether he stopped at the stop sign at the corner of Hewitt ad 156th Street.  He agreed that he was pulled over at the intersection of Prospect Avenue and Beck Street, although he recalled the officers' car's lights being on for only a few seconds before that.  (Tr. 211-12).

To the extent that the defendant's testimony differed from that of the officers it is less credible.  He appears to contend that the officers simply mistook his car for his neighbor's car, which was double parked.  However, the other vehicle he describes — an SUV — could not easily be mistaken for the sedan he was driving, and he appears to concede that the officers did in fact see a vehicle double parked.  Moreover, his testimony about his complicated driving maneuver, in which he nevertheless crossed the double yellow line, was far less credible than the straightforward testimony that the officers observed what they perceived to be an illegal U-turn.

After the defendant stopped his car, the officers got out of their car and approached the stopped vehicle, Officers Cepeda and Santiago walking up on the driver's side and Officer Pacheco

8

walking up on the passenger side.  (Tr. 28, 111, 173.)  As they were approaching, Officers Cepeda and Santiago saw the defendant through the rear window of the car and noticed him reach toward the center of the dashboard, underneath the windshield.  (Tr. 29-30, 111-12).  Although the defendant questions whether the officers could see through the car windows, the evidence at trial supported the testimony that the officers could indeed see into the car through the rear window and observe movements in the car.  (GX 124HD.)  Both Officers Cepeda and Santiago testified credibly that they regarded the movement as suspicious compared with the typical way in which motorists keep their hands when stopped by the police while waiting for officers to approach.  (Tr. 29-30, 112.)

Based on the movement toward the dashboard, her recollection of the vehicle the defendant was driving at the time of the June 1 arrest, and the defendant's face, Officer Cepeda recalled the circumstances of the previous arrest and the complainant's statement that the car contained a secret compartment that was used to hold a gun.  (Tr. 30-32.)  When she looked into the car, she noticed that the speaker was sticking out from the dashboard.  (Tr. 32-33; GX 124.)  Officer Cepeda also asked Officer Santiago, who was taking the defendant's driver's license and registration, to ask for the driver's name;

when the driver gave the name "Steven Torres," she recognized it as the name of the person she had arrested on June 1.  (Tr. 33.)

Based on all of the circumstances, including her recollection of the circumstances of the prior arrest and the defendant's suspicious movement toward the dashboard, Officer Cepeda suspected that the defendant might have a gun in the compartment in the dashboard.  (Tr. 33-34.)  She asked Officer Santiago to have the defendant step out of the car and the defendant exited the vehicle.  (Tr. 34.)  She asked him if he had any weapons on him, to which he responded that he had a blade in his pocket.  (Tr. 34.)  She removed the item, which was a utility knife, and patted him down to make sure he was not carrying any other weapons.  (Tr. 34; GX 37.)

After removing the knife, Officer Cepeda told the defendant to go to the back of his car and wait with Officers Santiago and Pacheco.  (Tr. 34-35.)  The officers testified credibly that the defendant was not told that he was being arrested at this time, was not placed in handcuffs, and was not placed in the officers' patrol car.  (Tr. 35, 92, 114, 173-74, 199.)  Officer Cepeda testified that she did not intend to arrest the defendant at that point.  (Tr. at 35.)  Rather, the defendant was detained under the supervision of Officers Santiago and Pacheco at the rear of his vehicle while Officer Cepeda checked the dashboard compartment for a weapon.  (Tr. 35, 114.)

Officer Cepeda went into the vehicle, lifted the speaker up
from the dashboard and reached inside.  She felt a firearm,
which she left in place.  (Tr. 36.)  She then got out of the car
and crossed her wrists in the shape of an X to signal to
Officers Santiago and Pacheco that they should cuff the
defendant.  (Tr. 36-37, 92, 173.)  The defendant was then placed
in handcuffs and put inside the patrol car.  (Tr. 36, 115, 174.)
His car was driven by Officer Santiago to the station house,
where the gun at issue on this suppression motion was recovered.
(Tr. 36-38, 115.)

The defendant again testified to a somewhat less credible
version of events.  He testified that Officer Cepeda pulled out
of the vehicle.  (Tr. 215.)  He testified that Officer Cepeda
took his knife, frisked him, and then placed him in handcuffs,
before bringing him to the back of the vehicle where he was
supervised by Office Pacheco.  (Tr. 216, 237.)  While standing
at the back of the Acura, the defendant and Officer Pacheco
allegedly discussed the defendant's pending case from June and
the defendant told Officer Pacheco that the defendant and his
girlfriend had resolved their differences and were going to have
a baby.  (Tr. 216, 239.)  The defendant testified that while he
was speaking to Officer Pacheco, Officers Cepeda and Santiago
were searching the car.  (Tr. 216.)  The defendant testified
that Officer Pacheco then placed the defendant into the back of

the patrol car, and that it was only while he was in the back of
the patrol car that Officer Cepeda found the gun in his car.
(Tr. 216-17.)  This version is directly contrary to the
testimony of the three officers, including the clear
recollection of each officer that Officer Cepeda only motioned
to handcuff the defendant after she had found the gun.
Moreover, Officer Cepeda's testimony is far more credible given
that all she had to do was conduct a quick search to determine
that the gun was indeed in the raised compartment where she
expected to find it.  There was hardly enough time or reason for
the defendant to have a leisurely conversation at the rear of
the car and to be placed into the police car before the weapon
was found.  Officer Pacheco testified credibly that he and
Officer Santiago only had the defendant at the rear of the
vehicle "momentarily" before Officer Cepeda motioned to handcuff
the defendant.  (Tr. 173.)  Indeed, the defendant's testimony
that he was placed in handcuffs and placed in the back of the
police car is inconsistent with his testimony that he did not
know he was being arrested.  (Tr. 238.)

Later in the day, Officer Cepeda issued the defendant a
traffic summons for double parking.  (Tr. 41-42; GX 212).  She
exercised her discretion not to cite the defendant for the
illegal U-turn.  (Tr. 42-43.)  That the officers had in fact
observed the defendant both make an illegal U-Turn and double

park is supported by the fact that the defendant recalls being asked whether he wanted a summons for double parking or the illegal U-Turn and saying that he preferred the summons for double parking because it would not count as heavily on his license.  (Tr. 225, 240.)


## II.

The defendant argues that the gun must be suppressed for two reasons.  First, he argues, the initial stop was not supported by probable cause and anything found as a result was the fruit of that unconstitutional seizure.  Second, he continues, even if that stop was legal, the subsequent search of the dashboard compartment was unconstitutional.  The Government responds by arguing that the initial stop was supported by probable cause that the defendant had committed a traffic violation, and that the search was justified either as a protective search or under the automobile exception to the Fourth Amendment.


## A.

Warrantless searches "are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-recognized exceptions." Katz v. United States, 389 U.S. 347, 357 (1967); see also Terry v. Ohio, 392

U.S. 1, 20 (1968); United States v. Scopo, 19 F.3d 777, 782 (2d Cir. 1994). Once a defendant has established a basis for a motion to suppress evidence, the Government bears the burden of proving, by a preponderance of the evidence, that the officers' actions were lawful. United States v. Echevarria, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010) (collecting cases).

A traffic stop constitutes a limited seizure within the meaning of the Fourth Amendment. Scopo, 19 F.3d at 781. Accordingly, such stops "must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct." Id. (internal quotation marks omitted). Probable cause exists "when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." United States v. Fisher, 702 F.2d 372, 375 (2d Cir. 1983). In making a reasonable suspicion determination, a court must look at the "totality of the circumstances" of the case to see whether the officer had a "particularized and objective basis" for suspecting legal wrongdoing. See United States v. Arvizu, 534 U.S. 266, 273 (2002). The officer's subjective motivation for a traffic stop is irrelevant. Whren v. United States, 517 U.S.

14

806, 812 (1996); see also Ashcroft v. Al-Kidd, No. 10-98, slip op. at 4 (S. Ct. May 31, 2011).

The officers testified credibly that they had observed at least two traffic violations.  Their personal observations gave them probable cause to believe that the driver of the vehicle had committed the traffic offenses, namely the double parking and the illegal U-Turn.[4]  The defendant's effort to blame the double parking on another vehicle and his self-serving testimony that he had not committed either offense were not credible. Therefore, the stop of the car was not unconstitutional.


**B.**

The defendant further argues that, even if the stop itself was constitutional, the search of the compartment containing the gun was not.  The Government responds that the search was justified either as a protective search or pursuant to the automobile exception to the Fourth Amendment.


1.

In the interest of safety, an officer may ask a suspect to exit the vehicle while a stop is being conducted and frisk him

---

[4] The officers had probable cause to believe that a U-turn across a double yellow line in the middle of the block would be disobedience to an official traffic control device in violation of New York Vehicle and Traffic Law § 1110(a).  "Markings" are a traffic control device.  N.Y. Veh. & Traffic Law § 153.

for weapons if there is reason to believe he may be armed and presently dangerous.  See Pennsylvania v. Mimms, 434 U.S. 106, 111-12 (1977).  By the same token, "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." Michigan v. Long, 463 U.S. 1032, 1049 (1983) (citation and internal quotation marks omitted).[5]

Under Long, an officer conducting an investigative detention may also conduct a protective search of areas of the passenger compartment of an automobile where "a weapon may be placed or hidden" even though the suspect is under the supervision or control of the officers at the scene during the search, so long as the officer has a reasonable suspicion that the suspect is potentially dangerous.  Long, 463 U.S. at 1049, 1051-52.  In Long, the Supreme Court rejected the argument that it was unreasonable for two police officers who had detained a

---

[5] See also United States v. Hassock, 631 F.3d 79, 85 (2d Cir. 2011) ("'[I]n a sense, Long authorized a 'frisk' of an automobile for weapons.'") (quoting Maryland v. Buie, 494 U.S. 325, 332 (1990)); McCardle v. Haddad, 131 F.3d 43, 48 (2d Cir. 2007) ("[W]here there has been a Terry stop of an automobile, the officer may 'tak[e] steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.'") (quoting Terry, 392 U.S. at 23).

suspect outside his vehicle to fear that the suspect could injure them, noting that a suspect "may, despite being under the brief control of a police officer . . . , break away from police control and retrieve a weapon from his automobile" or "be permitted to reenter his automobile" if not arrested at the conclusion of an investigative detention.  Id. at 1051-52.

Contrary to the defendant's arguments, Long's holding is undisturbed by the Supreme Court's decision in Arizona v. Gant, 129 S. Ct. 1710, 1721 (2009), which does not apply to this case. In Gant, the defendant was arrested for driving with a suspended license, handcuffed, and locked in a patrol car before officers searched his car and found contraband.  Gant, 129 S. Ct. at 1714.  The Supreme Court held that law enforcement officials cannot automatically conduct a safety sweep of a vehicle incident to a custodial arrest; rather, they may conduct a post-arrest sweep only if the arrestee is within reaching distance of the passenger compartment at the time of the search.  Gant, 129 S. Ct. at 1719.

Gant is a limitation on the scope of the "search incident to arrest" exception to the Fourth Amendment, rather than a limitation on the protective search exception in Long. Recognizing the authority of Gant, the Government does not attempt to rely on any argument that the search in this case was justified under the doctrine of a search incident to arrest,

17

because it is plain that the defendant was not in a position to reach into the car and retrieve the weapon after his arrest. Rather, the Government relies on the continuing viability of the protective search exception in Long.

Because Gant dealt specifically with a protective search conducted incident to a custodial arrest, it does not address a protective search conducted during a traffic stop, in which the occupant of the vehicle may return to the car and have access to any weapons inside the vehicle once the stop is over.  Indeed, Gant specifically identified Long as an exception to the warrant requirement that would be unaffected by its holding.  Id. at 1721.  And courts following Gant have declined to extend the holding beyond the context of a limitation on the search incident to arrest exception to the Fourth Amendment.  See, e.g., United States v. Vinton, 594 F.3d 14, 24 n.3 (D.C. Cir. 2010); United States v. Griffin, 589 F.3d 148, 154 n.8 (4th Cir. 2009).

Officer Cepeda's search was fully justified under Long. The defendant's vehicle was validly stopped based on the multiple traffic infractions that the officers observed.  Upon approaching the vehicle, both Officer Cepeda and Officer Santiago saw the defendant make a suspicious movement toward the dashboard.  That movement alone was sufficient to justify a protective search of the dashboard compartment.  See, e.g.,

United States v. Paulino, 850 F.2d 93, 97 (2d Cir. 1988)
(upholding search for weapons under car floor mat after
defendant was observed making furtive movement in that
direction).  Officer Cepeda also knew that the defendant's
girlfriend had previously stated that the defendant kept a gun
in that compartment.  Officer Cepeda had confirmed the existence
of the compartment during the previous arrest and saw that the
compartment was sticking up during the September 21 stop.

In addition, Officer Cepeda had reason to believe that the
defendant was armed and dangerous.  She was aware that the
defendant's criminal record included arrests for violent crimes
and that the defendant's girlfriend had reported that he had a
history of violence and had threatened to shoot both her and
their child.  Officer Cepeda also knew that the defendant had a
knife with him both times she had encountered him and that he
possessed a police baton and a gun holster.

Given the "totality of the circumstances" and these
"specific and articulable facts," Officer Cepeda had ample
reason to believe that the defendant might have a weapon in the
hidden compartment in his dashboard.  Further, under Long, she
acted within constitutional bounds in conducting a protective
search based on this reasonable suspicion prior to the
defendant's arrest.  Given the presence of three police
officers, it is unlikely that the defendant could have reached

into the vehicle to obtain the secreted weapon.  But if the officers had not taken the defendant to the stationhouse — and Officer Cepeda testified that she did not intend to arrest the defendant at that point — there remained the real possibility that he would have reentered the vehicle and regained access to any weapon inside the hidden compartment.  See Gant, 129 S. Ct. at 1724 (Scalia, J., concurring) ("In the no-arrest case, the possibility of access to weapons in the vehicle always exists, since the driver or passenger will be allowed to return to the vehicle when the interrogation is completed.").

Accordingly, the seizure of the gun was valid pursuant to a constitutional search.

2.

The seizure was also justified under the automobile exception to the Fourth Amendment.  As the Supreme Court reaffirmed in Gant, "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity, United States v. Ross, [456 U.S. 798, 820-21 (1982)], authorizes a search of any area of the vehicle in which the evidence might be found." Gant, 129 S. Ct. at 1721; see also United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004).  Where the exception applies, it permits a search of both the car and any hidden or locked containers found within.  See, e.g., California v. Acevedo, 500

20

U.S. 565, 580 (1991) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained."); see also United States v. Almaraz, No. 09 Cr. 159, 2009 WL 1835951, at *2 (S.D.N.Y. June 26, 2009) ("Gant does not alter the broader automobile exception to the warrant requirement . . . .").

For the same reasons that Officer Cepeda had reason to believe that the defendant had a firearm hidden inside the dashboard, she had probable cause to believe that the car contained contraband.  Indeed, courts have specifically held that "evidence of a hidden compartment when coupled with other suspicious circumstances can contribute to probable cause to search a vehicle."  United States v. Stephenson, 452 F.3d 1173, 1177 (10th Cir. 2006); United States v. Carrillo, 269 F.3d 761, 767 (7th Cir. 2001) (same).

In this case, as discussed above, Officer Cepeda knew that the car contained a hidden compartment that could be used to hide a gun, and had been told that the defendant kept a gun in that compartment.  She saw the defendant reach for the hidden compartment as the police approached the vehicle.  She knew that she had filed previous complaints against the defendant for illegal possession of weapons and she had probable cause to believe that the compartment would contain evidence of the crime of illegal possession of a weapon.  See, e.g., N.Y. Penal Law §

265.01.  Under the totality of the circumstances, she had

probable cause to believe that the defendant was illegally in

possession of a firearm and that the hidden compartment

contained evidence of this criminal activity.

**CONCLUSION**

For the reasons explained above, the motion to suppress is

denied.

SO ORDERED.

Dated:     New York, New York
           June __ , 2011

_____
              John G. Koeltl
         United States District Judge

22